### AFFIDAVIT OF SPECIAL AGENT KEVIN M. McCUSKER

I, Kevin M. McCusker, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. I have been so employed as a Special Agent for over eleven (11) years. Since August 2011, I have been assigned to the Boston Field Office economic crimes squad. Prior to this assignment, I investigated matters concerning National Security in Minneapolis and Boston Field Offices. I hold a Bachelor's degree in Accounting and an inactive Certified Public Accountant license. As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I am submitting this affidavit in support a criminal complaint charging DANIEL J. FLYNN III with wire fraud, in violation of 18 U.S.C. § 1343.

3. The facts in this affidavit come from personal involvement in this investigation, including interviews of witnesses as well as my review of documents and bank records. In submitting this affidavit, I have not included every fact known to me about this investigation. Instead, I have only included facts that I believe are sufficient to establish probable cause. All references to dates and monetary amounts in this affidavit are approximate and not exact.

### Overview of the Fraud Scheme

4. Defendant DANIEL J. FLYNN III ("FLYNN"), a resident of Milton, Massachusetts, was the principal of several real estate development businesses in Massachusetts, including Daniel J. Flynn & Co., Inc. ("DJFCO"). FLYNN also worked as professional real estate agent and real estate auctioneer in Massachusetts.

1

5.  FLYNN induced individual investors in Massachusetts and elsewhere to give him large sums of money to invest in commercial and residential real estate in the greater Boston area. Over the course of the fraud, FLYNN made a consistent pitch. FLYNN told investors that because of his involvement in the real estate/auction industry and his relationship with local area banks, he was able to learn about distressed or undervalued properties for what FLYNN described as opportunistic investments.

6.  FLYNN induced individual investors to loan him large sums of money (ranging from between $10,000 to $500,000) in exchange for significant, short-term returns. FLYNN told investors that he would use their money to purchase and invest in specific pieces of residential and commercial real estate.

7.  There were several aspects to FLYNN's fraudulent scheme involving material misrepresentations that FLYNN made to his investors, each related to his real estate investment business. First, FLYNN falsified the value of his real estate investment fund by creating fraudulent promissory notes purportedly worth millions and representing to investors that promissory notes were legitimate debts that were owed to FLYNN's real estate investment fund.

8.  Second, FLYNN repeatedly induced investors to loan him money to purchase specific pieces of property that in some cases FLYNN already owned through entities he controlled. Over the course of the fraud, FLYNN used a single piece of property to obtain loans from at least three different groups of investors. At times, FLYNN also promised investors that he would secure that loan through a mortgage on the property, but would then fail to record the mortgage and obtain a loan from an unrelated investor for the purchase of the same piece of property.

9.      Third, contrary to FLYNN's assertions that he would be using the investor's money to purchase a specific piece of real estate, FLYNN often use the investor's money to pay his own personal debts and to repay prior investors.  Fourth, once investors eventually uncovered FLYNN's fraudulent activities, FLYNN changed the name of his business and created similar entities through the names of third parties in an effort to conceal his fraudulent activities.

## DJF Real Estate Opportunity Fund 1

10.     DJF Real Estate Opportunity Fund 1, L.P (the "Fund") was a private investment fund that FLYNN formed in approximately November 2007 with a second individual ("Individual 1") who FLYNN recruited to serve with him as a general partner to the Fund.

11.     According to the Fund's executive summary in its "Private Placement Memorandum" dated April 16, 2007, the Fund was described as "a newly-formed private investment fund that will make opportunistic investments in commercial and residential real estate."  The executive summary further stated that the "Fund's primary focus is expected to be commercial and multi-family residential real estate or loans secured by such real estate."  The executive summary further described the "target investments" as "opportunistic or undervalued properties that can be acquired by the Fund with any equity investment of $500,000 to $5 million."  The executive summary further stated the Fund had been involved in 17 prior real estate investments totaling over $21 million that had generated an internal rate of return[1] of over 203 percent.

12.     At its start, the Fund included two general partners (FLYNN and Individual 1) who were to each contribute $1 million and approximately twenty-five (25) individual limited

---

[1] In general terms, an internal rate of return is used to measure and compare the profitability of certain capital investments. The term "internal" refers to the fact that its calculation does not incorporate external factors such as interest or inflation.

3

partners[2] who each contributed between $50,000 and $500,000 for an initial total investment of over $6.3 million.

13. In January 2008, FLYNN caused individual subscription agreements to be sent to the limited partners in Massachusetts, New York, New Jersey, California, and elsewhere. In the cover letter to the subscription agreements dated January 14, 2008, FLYNN represented that as of January 4, 2008, the Fund had over "8.5 million in committed capital."

14. One of the limited partners of the Fund was an individual I interviewed in September 2014 herein referred to as "Victim 1." According to Victim 1, the strategy of the Fund was to purchase distressed properties about which FLYNN would become aware through his involvement in the real estate and auction business and because of FLYNN's relationship with area banks. FLYNN said he would either improve and sell the properties or rent the properties to make money for the Fund. Victim 1 invested $500,000 in the Fund and signed an agreement where the Fund agreed to repay Victim 1 his investment plus interest. Victim 1's investment to the Fund was never repaid and Victim 1 later filed a civil suit against FLYNN.

15. Between April 2010 and continuing until April 2012, FLYNN provided periodic updates to the Fund's limited partners. The updates were signed by the two general partners, FLYNN and Individual 1. FLYNN prepared the updates, though they were reviewed by Individual 1. The updates summarized the Fund's performance and assets. With regard to the real estate investments, the updates indicated what the Fund had paid for specific pieces of property and provided a fair market value.

16. The updates were then provided to the investors in the form of letters that were either mailed or e-mailed to the limited partners. The e-mails were routed over the internet

---

[2] A list of these initial limited partners is included in Attachment B to a search warrant application, which is filed under seal.

through servers outside Massachusetts. As further described below, the e-mails that FLYNN caused to be sent to the Fund's limited partners included e-mails as recent as April 2012.

### The Fraudulent Promissory Notes

17. The items that FLYNN listed in the Fund's investment portfolio (in a schedule entitled "Investment Summaries") included six or seven different investment properties and a series of eight or nine outstanding promissory notes. The promissory notes, purportedly representing debts that were owed to the Fund, were listed as having a combined face value of over $2.3 million. These promissory notes were represented in the updates that were e-mailed to investors, including an update e-mailed on April 12, 2012, that indicated the Fund's portfolio contained a total of nine promissory notes with a total value of more than $2.3 million.

18. The promissory notes were fraudulent. During the investigation, I interviewed six of the individuals listed on the promissory notes. Each one of the six individuals confirmed that they did not recognize the document and that the signature on the notes was in fact not their signature.

19. Around 2009 or 2010, Individual 1 asked an individual referred to herein as "Witness 1" to look into the management of the Fund. Witness 1 ultimately discovered several irregularities in FLYNN's records including the fact that the promissory notes that FLYNN listed as being a part of the Fund's investment portfolio were either not real or had already been paid back to the Fund.

20. In or about June/July 2012, over a series of meetings and phone calls, Individual 1 and Witness 1 confronted FLYNN about the fraudulent promissory notes. FLYNN admitted to Individual 1 and Witness 1 that he had in fact fabricated the promissory notes but indicated that he would make things right. Around the same time, in July 2012, Individual 1 and Witness 1

caused FLYNN to resign from the Fund.  Shortly thereafter, multiple investors filed civil suits against FLYNN and his companies alleging a combined loss of more than $9 million.

### The 86 Greenleaf Property

21. Over the course of the fraud, FLYNN often used the same piece of property to entice investors to loan him money. In July 2008, FLYNN caused the Fund to purchase a nine-unit condominium building located at 86 Greenleaf Street, Quincy, Massachusetts ("the 86 Greenleaf Property") for approximately $2.2 million through an entity called "86 Greenleaf, LLC." During the periodic updates that FLYNN provided to limited partners of the Fund between April 2010 and April 2012, FLYNN listed the 86 Greenleaf Property as one of the Fund's most significant assets.

22. In or about February 2011, FLYNN caused an individual referred to herein as "Victim 2" to loan FLYNN a total of approximately $750,000 that FLYNN said would be used to develop the 86 Greenleaf Property, a property the Fund already owned. In exchange for the two loans that Victim 2 gave FLYNN in the amounts of $250,000 and $500,000, FLYNN executed two different promissory notes for Victim 2 with a promise to repay the loan plus interest. In the promissory notes, FLYNN gave Victim 2 a mortgage on the 86 Greenleaf Property to secure Victims 2's loan and represented to Victim 2 that he would record Victim 2's mortgage on the property at the Registry of Deeds in Norfolk County. FLYNN, however, did not record Victim 2's mortgage.

23. About a month later, on March 21, 2011, FLYNN transferred the title to the 86 Greenleaf Property from "86 Greenleaf, LLC" to a similar sounding entity FLYNN created on March 7, 2011, called "86 Greenleaf Condominium, LLC." The same day, on March 21, 2011, FLYNN granted a mortgage for the 86 Greenleaf Property in the amount of $1.15 million to

another unrelated party in the name of TDC Secured Strategies, LLC. FLYNN ultimately recorded Victim 2's mortgage, but only after he recorded the $1.15 million mortgage for TDC Secured Strategies, LLC and failed to repay Victim 2. Thereafter, in June 2012, Victim 2 filed a civil suit against FLYNN in Norfolk Superior Court.

24. In January 2012, FLYNN convinced three additional victims (referred to herein as "Victims 3, 4 and 5") to invest in the 86 Greenleaf Property. FLYNN met with Victims 3, 4, and 5 in Boston in late December 2014, told them about the profitability of his real estate investment business, and told them he would use their money to purchase a specific piece of real estate in exchange for a six-month promissory note with an interest rate of between 12 to 15 percent. In particular, FLYNN told Victim 3 that he could buy the 86 Greenleaf Property from the Bank of Canton for about $850,000, but stressed to Victim 3 that he needed the money quickly. FLYNN explained to Victim 3 that his company, DJFCO, would invest Victim 3's money into an entity known as Opportunity Holdings, LLC which would then purchase the 86 Greenleaf Property from the Bank of Canton.

25. Based on these representations, on or about January 12 and 13, 2012, Victims 3, 4 and 5 wired $250,000, $225,000, and $400,000 to FLYNN's account at Eastern Bank held in the name of Opportunity Holdings, LLC for the purchase of the 86 Greenleaf Property. In return, FLYNN executed promissory notes for Victims 3, 4, and 5 with a promise to repay the principals of the loans along with 15 percent interest within six-months.

26. In addition to the fact that FLYNN already owned the 86 Greenleaf Property, an analysis of FLYNN's bank accounts revealed that FLYNN in fact did not use the money from Victims 2, 3 and 4 to invest in the 86 Greenleaf Property, but instead used the money to repay earlier investors and fraud victims. Prior to the three wire transfers described above from Victims

3, 4, and 5 on January 12 and 13, 2012, the balance for FLYNN's account at Eastern Bank was only $95.00. Shortly after these incoming wire transfers of funds from Victims 3, 4, and 5, on January 13, 2012, FLYNN wired almost all the money out of the account, including: one wire in the amount of $287,500 to an individual for the benefit of a company called "East Coast Management, Inc."[3]; and two wires in the amount of $230,000 to the Roth IRA account of another individual who had also loaned money to FLYNN and who had filed a lawsuit against FLYNN for the return of the money.

27.     Several months after making their investment to FLYNN, Victims 3, 4 and 5 learned that FLYNN already owned the 86 Greenleaf Property and Victim 3 contacted FLYNN about the true ownership of the property. FLYNN told Victim 3 that it did not matter if he put the money into the 86 Greenleaf Property because Victim 3 had a promissory note from FLYNN. Victim 3 responded that the reason that Victims 3, 4, and 5 gave FLYNN the money was to allow FLYNN to purchase the 86 Greenleaf Property from the Bank of Canton. In other contacts with FLYNN, Victims 3, 4, and 5 asked FLYNN why the condominium units at 86 Greenleaf were not listed for sale. FLYNN responded by asking if they (Victims 3, 4, and 5) were checking titles and questioned whether they trusted FLYNN. Victims 3, 4, and 5 later filed a civil suit in Norfolk Superior Court in November 2012 for return of the money.

### Fenway Auction Group

28.     Following FLYNN's resignation from the Fund in July 2012, in February 2014, FLYNN created another real estate-related business under the name "Fenway Auction Group."

---

[3] Between July 2011 and September 2011, the individual associated with companies East Coast Management and East Coast Realty (and a person who is most likely a relative of this individual) wired a total of approximately $700,000 from investment custodial accounts to FLYNN's account at Eastern Bank under the name "Opportunity Holdings, LLC." After this, between October 2011 and March 2012, FLYNN wired a total of more than $1.2 million to an account associated with this same individual and his company.

In or about late 2013, an individual referred to herein as "Witness 2"[4] began working for FLYNN as a bookkeeper at DJFCO at 161 Granite Avenue, Dorchester, Massachusetts in the basement office suite which is Suite #1. While working there, Witness 2 reviewed FLYNN's books and records and observed that FLYNN had tens of thousands of dollars due in unpaid bills and owed a number of individuals over $100,000 apiece. These individuals would call FLYNN at his office. Witness 2 and FLYNN's secretary answered these calls and would try to calm them down.

29. According to Witness 2, FLYNN was borrowing money from individuals and used the money for personal expenses. For example, Witness 2 said that FLYNN borrowed $100,000 from an individual referred to herein as "Victim 6" and that FLYNN told Victim 6 that the money would be used to invest in real estate. Instead, FLYNN used the money to pay a Milton-based contractor to finish the basement of his Milton home. When Victim 6 called FLYNN looking for the money, FLYNN told Victim 6 that he had about $98,000 in his bank account, when Witness 2 in fact knew that FLYNN had only a minimal balance in his account.

30. In approximately February 2014, FLYNN asked Witness 2 to help him borrow $100,000 from a local bank. Although Witness 2 was not able to secure the loan, FLYNN suggested that Witness 2 and FLYNN start a new company that would not be in FLYNN's name and would not be associated with FLYNN, even though it would be FLYNN's company. After this, Witness 2 created an entity called "Fenway Auction Group, LLC" even though Witness 2 had no experience in the auction business. According to Witness 2, even though the company

---

[4] It should be noted that in addition to pleading guilty to a theft offense, at the time Witness 2 was working for FLYNN, Witness 2 was using a name that Witness 2 had stolen from a roommate's credit card application. Witness 2 also has a history of drug abuse, though Witness 2 stated that he/she has not used any illegal drugs for the past several years.

was in Witness's 2's name, FLYNN basically operated DJFCO's business with Witness 2's company and attempted to solicit loans from investors and engaged in a series of auctions.

31. Around the same time, FLYNN was served with more lawsuits. Witness 2 left his job with FLYNN but took the bank accounts at Fenway Auction Group with him. Witness 2 said that FLYNN then accused him of stealing $100,000, filed a complaint against Witness 2, and got him arrested. Witness 2 maintained that the allegation was a lie, even though he later pled guilty and agreed to return $25,000 to FLYNN.

### Conclusion

32. Based on the foregoing, I submit there is probable cause to believe that DANIEL J. FLYNN III has committed the crime of wire fraud, in violation of 18 U.S.C. § 1343.

Signed under the pains and penalties of perjury this 26th day of August, 2015.

Kevin M. McCusker
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 26th day of August, 2015.

HON. MARIANNE B. BOWLER
U.S. MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS